Filed 7/8/13

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| SIERRA CLUB, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | S194708 |
| v. | ) | |
| | ) | Ct.App. 4/3 G044138 |
| THE SUPERIOR COURT OF ORANGE | ) | |
| COUNTY, | ) | Orange County |
| | ) | Super. Ct. No. 134941 |
| Respondent; | ) | |
| | ) | |
| COUNTY OF ORANGE, | ) | |
| | ) | |
| Real Party in Interest. | ) | |
| _____ | ) | |

Like many counties in California, Orange County (the County) maintains a large database of information about land parcels in a geographic information system (GIS) file format. With this database, called the OC Landbase, a user with appropriate software can create a layered digital map containing information for over 640,000 specific parcels of land in Orange County, including geographic boundaries, assessor parcel numbers, street addresses, and links to additional information on the parcel owners. The issue in this case is whether the OC Landbase is subject to disclosure in a GIS file format at the actual cost of duplication under the California Public Records Act or whether, as the County contends, it is covered by the statute's exclusion of "[c]omputer software" (Gov. Code, § 6254.9, subd. (a)) — a term that "includes computer mapping systems" (*id.*, § 6254.9, subd. (b)) — from the definition of a public record. We hold that although GIS mapping software falls within the ambit of this statutory exclusion, a GIS-formatted database like the OC Landbase does not. Accordingly, such databases are public records that, unless otherwise exempt, must be produced upon request at the actual cost of duplication.

1

## I.

In June 2007, petitioner Sierra Club sent a letter to the Orange County Assessor requesting a copy of the OC Landbase pursuant to the California Public Records Act (PRA). Amici curiae representing a variety of media and open-government groups explain the functionality and value of the database at issue: "Using software available on the open market and the GIS-formatted landbase that is at issue in this case, any interested person can layer other publicly available electronic datasets on top of the landbase and perform a computer-assisted analysis of those datasets in ways that are simply not possible without the base layer. . . . [¶] For example . . . a property owner can use GIS-formatted landbase data to locate other similar parcels and see whether [the owner's] taxes are higher or lower than those being paid by others, or to determine whether zoning decisions are similar as to comparable properties, which in turn can shed light on the fairness of a government's taxing or zoning decisions. . . . [P]ublic dissemination of GIS-formatted mapping data is also critical to the non-profit sector's ability to monitor and respond to government actions involving real property. For example, Petitioner Sierra Club sought the records at issue in this action to determine — and convey to the public — the status of large areas of open space in Orange County, including whether each area is protected from development by conservation easements or public ownership or is threatened by a proposed development."

Sierra Club's request began a lengthy exchange between the two parties concerning the public record status of the OC Landbase. In March 2009, the County agreed to produce records containing the information underlying the OC Landbase, including assessment rolls, parcel maps, tract maps, survey records, lot line adjustments, and transfer deeds. The County offered to provide such records in Adobe PDF electronic format or as printed paper copies. However, the County took the position that the PRA did not require it to disclose the same records in a GIS file format and that it would provide the records in that format only if Sierra Club paid a licensing fee and agreed to the license's restrictions on disclosure

and distribution. According to the County, the licensing agreement enables the County to recoup a portion of the substantial costs it incurs to develop and maintain the OC Landbase. A 2009 declaration by the County's surveyor reported that the County had spent over $3 million in the previous five years to maintain the OC Landbase. According to Sierra Club's expert, the County's licensing policy is different from the practice of most counties in California: 47 of the state's 58 counties, including Los Angeles County, provide access to GIS-formatted parcel base maps as public records. If the OC Landbase must be disclosed as a public record, the County could charge Sierra Club only the actual cost of duplication. If it is not, the County has the option to license the database according to the terms of its licensing policy.

Sierra Club sought a writ of mandate from the superior court to compel the County to provide the OC Landbase in a GIS file format as a public record for a fee covering only the direct cost of duplication, with no requirement that Sierra Club comply with the licensing agreement. Before ruling, the superior court permitted extensive briefing from both parties and conducted a two-day evidentiary hearing. The hearing focused on the County's claim that the OC Landbase was excluded from the PRA's definition of a public record because it fell within the statutory exclusion for "computer software," a term that "includes computer mapping systems." (Gov. Code, § 6254.9, subds. (a), (b) (hereafter section 6254.9(a) and section 6254.9(b)); all further undesignated statutory references are to the Government Code.)

Before the hearing, the parties stipulated that the OC Landbase refers to the County's parcel data in a GIS file format. They defined "GIS file format" to mean "that the geographic data can be analyzed, viewed, and managed with GIS software, and it includes formats such as ESRI Shape Files, Modular GIS Environment ('MGE'), and Oracle Spatial." Although the County uses the term "Landbase" internally to refer to its entire mapping system — not only the data but also the software used to run it — the County confirmed at the hearing that the term "Landbase," when used externally, refers

3

only to the parcel map data held in a GIS file format. The parties agree that "[t]he OC Landbase in the format the Sierra Club has requested, and in which it is currently distributed to OC Landbase licensees, does not contain programs, routines, and symbolic languages that control the functioning of computer hardware and direct its operation." The County relies on software obtained from Oracle to create and access the OC Landbase. If the OC Landbase is produced in a GIS file format, Sierra Club must use its own GIS software to access the data.

Following the evidentiary hearing, the superior court issued an order denying the petition for writ of mandate, along with a 16-page statement of decision. The court found that the County "offered persuasive testimony and evidence that the term 'GIS' refers to 'an integrated collection of computer software and data used to view and manage information about geographical places, analyze spatial relationships and model spatial processes.'" The court further "credit[ed] the County's evidence and the testimony of witnesses that the OC Landbase in a GIS file format is part of a computer mapping system." "To that end, the OC Landbase in GIS file format is not a public record, but falls within Section 6254.9's exception to the PRA's general rules of disclosure." On that basis, the superior court denied Sierra Club's petition for writ of mandate.

On appeal, the Court of Appeal affirmed. Finding the statutory language ambiguous, the Court of Appeal determined that the legislative history of section 6254.9 supported the County's position that GIS-formatted files fall within the meaning of "computer mapping system." Based on its review of the legislative history and purpose of section 6254.9, the Court of Appeal concluded that the County met its burden to prove that the OC Landbase was not a public record subject to disclosure.

We granted review and now reverse.

## II.

The PRA and the California Constitution provide the public with a right of access to government information. As this court has explained: "Openness in government is

4

essential to the functioning of a democracy. 'Implicit in the democratic process is the notion that government should be accountable for its actions. In order to verify accountability, individuals must have access to government files. Such access permits checks against the arbitrary exercise of official power and secrecy in the political process.' [Citation.]" (*International Federation of Professional & Technical Engineers, Local 21, AFL-CIO v. Superior Court* (2007) 42 Cal.4th 319, 328–329 (*Local 21*).) In adopting the PRA, the Legislature declared that "access to information concerning the conduct of the people's business is a fundamental and necessary right of every person in this state." (§ 6250.) "As the result of an initiative adopted by the voters in 2004, this principle is now enshrined in the state Constitution . . . ." (*Local 21*, at p. 329.) The California Constitution, article I, section 3, subdivision (b)(1) provides: "The people have the right of access to information concerning the conduct of the people's business, and therefore, the meetings of public bodies and the writings of public officials and agencies shall be open to public scrutiny."

The PRA applies to "public records," defined as "any writing containing information relating to the conduct of the public's business prepared, owned, used, or retained by any state or local agency regardless of physical form or characteristics." (§ 6252, subd. (e).) In this case, the County's offer to produce alternative records with the information underlying the OC Landbase implicitly recognizes that the *information* within the OC Landbase constitutes public records subject to disclosure unless otherwise exempt from the PRA. What the parties dispute is whether the OC Landbase *in a GIS file format* is a public record that must be disclosed in that format pursuant to the PRA.

The format of information is not generally determinative of the public record status of government information. A 2000 amendment to the PRA makes electronic data available in whatever format it is normally maintained by the agency. (§ 6253.9, added by Stats. 2000, ch. 982, § 2, p. 7142.) Section 6253.9 provides in relevant part: "(a) Unless otherwise prohibited by law, any agency that has information that constitutes an

identifiable public record not exempt from disclosure pursuant to this chapter that is in an electronic format shall make that information available in an electronic format when requested by any person and, when applicable, shall comply with the following: [¶] (1) The agency shall make the information available in any electronic format in which it holds the information. [¶] (2) . . . The cost of duplication shall be limited to the direct cost of producing a copy of a record in an electronic format." (§ 6253.9, subd. (a)(1), (2) (hereafter section 6253.9(a)(1) and section 6253.9(a)(2)).) Section 6253.9 further provides: "Nothing in this section shall be construed to require the public agency to release an electronic record in the electronic form in which it is held by the agency if its release would jeopardize or compromise the security or integrity of the original record or of any proprietary software in which it is maintained." (§ 6253.9, subd. (f).)

However, a separate provision of the PRA, section 6254.9(a), excludes "[c]omputer software" from the definition of a public record. Section 6254.9(b) says, " 'computer software' includes computer mapping systems, computer programs, and computer graphics systems." The question before us is whether the term "computer software," as used in section 6254.9, encompasses the OC Landbase in a GIS file format. If so, then the GIS-formatted OC Landbase is not a public record subject to disclosure; if not, then it is a public record subject to disclosure unless otherwise exempt under the PRA.

**A.**

When we interpret a statute, "[o]ur fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose. We first examine the statutory language, giving it a plain and commonsense meaning. We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment. If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. If the

statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy." (*Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737.) "Furthermore, we consider portions of a statute in the context of the entire statute and the statutory scheme of which it is a part, giving significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose." (*Curle v. Superior Court* (2001) 24 Cal.4th 1057, 1063.)

In this case, our usual approach to statutory construction is supplemented by a rule of interpretation that is specific to the issue before us. In 2004, California voters approved Proposition 59, which amended the state Constitution to provide a right of access to public records. As noted, article I, section 3, subdivision (b)(1) provides: "The people have the right of access to information concerning the conduct of the people's business, and therefore, the meetings of public bodies and the writings of public officials and agencies shall be open to public scrutiny." Subdivision (b)(2) provides guidance on the proper construction of statutes affecting this right of access: "A statute, court rule, or other authority, including those in effect on the effective date of this subdivision, shall be broadly construed if it furthers the people's right of access, and narrowly construed if it limits the right of access." In addition, subdivision (b)(5) provides: "This subdivision does not repeal or nullify, expressly or by implication, any constitutional or statutory exception to the right of access to public records or meetings of public bodies that is in effect on the effective date of this subdivision, including, but not limited to, any statute protecting the confidentiality of law enforcement and prosecution records." (Cal. Const., art. I, § 3, subd. (b).)

Sierra Club does not independently challenge the denial of access to the GIS-formatted OC Landbase as a constitutional violation if disclosure is not required by the PRA, and in light of article I, section 3, subdivision (b)(5), we may not countermand the Legislature's intent to exclude or exempt information from the PRA's disclosure

requirements where that intent is clear.  But to the extent that legislative intent is ambiguous, the California Constitution requires us to "broadly construe[]" the PRA to the extent "it furthers the people's right of access" and to "narrowly construe[]" the PRA to the extent "it limits the right of access."  (Cal. Const., art. I, § 3, subd. (b)(2).)  "Given the strong public policy of the people's right to information concerning the people's business (Gov. Code, § 6250), and the constitutional mandate to construe statutes limiting the right of access narrowly (Cal. Const., art. I, § 3, subd. (b)(2)), 'all public records are subject to disclosure unless the Legislature has *expressly* provided to the contrary.' "  (*Office of Inspector General v. Superior Court* (2010) 189 Cal.App.4th 695, 709, quoting *Williams v. Superior Court* (1993) 5 Cal.4th 337, 346, italics added by the Court of Appeal; see also *Local 21*, *supra*, 42 Cal.4th at p. 348 (conc. & dis. opn. by Kennard, J.) [courts must narrowly construe any statute limiting the people's right of access to public records].)

**B.**

With these principles in mind, we turn to the relevant statutory language.  Section 6254.9(a) provides:  "Computer software developed by a state or local agency is not itself a public record under this chapter.  The agency may sell, lease, or license the software for commercial or noncommercial use."  Section 6254.9(b) says:  "As used in this section, 'computer software' includes computer mapping systems, computer programs, and computer graphics systems."  Further, section 6254.9, subdivision (d) (hereafter section 6254.9(d)) provides:  "Nothing in this section is intended to affect the public record status of information merely because it is stored in a computer.  Public records stored in a computer shall be disclosed as required by this chapter."  We must decide whether the statutory exemption for "[c]omputer software" (§ 6254.9(a)) — a term that "includes computer mapping systems" (§ 6254.9(b)) — encompasses mapping data in a GIS file format, as the County contends, or only GIS mapping software, as Sierra Club contends.

In construing "computer mapping systems" in section 6254.9(b), neither party has offered any standard definition of the term, and dictionary definitions provide little help.

8

The Court of Appeal relied on a definition of the word "system" as a " 'complex unity formed of many often diverse parts subject to a common plan or serving a common purpose' " (quoting Webster's 3d New Internat. Dict. (2002) p. 2322) to conclude that "a computer mapping *system* should include more than solely a computer *program* component." Similarly, the County argues that a computer mapping system includes not only mapping software but also databases in a format compatible with mapping software, since such formatting, unlike a printed copy or PDF version of the underlying data, enables a database to function as part of a computer mapping *system*. But this interpretation, though reasonable, is not compelled by the ordinary meaning of "system," a rather general word that is just as reasonably construed to refer only to mapping software.

Part of the challenge in construing "computer mapping system" is that the technology for geographic information management and analysis has evolved significantly since its inception in the 1960s. As recounted by Sierra Club's expert, early computer graphics systems could only create drawings with lines and other geometric features. At the next stage, computer-aided drafting systems allowed users to create more precise engineering drawings. Next came automated mapping systems, also called computer-aided mapping, which allowed users to link their drawings with coordinating degrees representing the surface of the earth. Later programs allowed users to connect automated mapping (AM) systems with facility management (FM) systems. These AM/FM systems linked drawings with informational databases, including parcel databases. Finally, AM/FM systems were supplanted by modern GIS systems that allow complex geospatial and topographical analysis.

According to the County's deputy surveyor, the term "computer mapping system" as used in 1988, when section 6254.9 was enacted, is simply a precursor to GIS technology and necessarily includes both software and related databases. Sierra Club's expert counters that while the term "GIS" can be used broadly today to refer to both

9

software and GIS-formatted data, the term "computer mapping system" as used in the 1980s referred only to a system of linked software modules and did not include any related databases. Both parties point to a 2006 text defining "GIS" as "[a]n integrated collection of computer software and data used to view and manage information about geographic places, analyze spatial relationships and model spatial processes. A GIS provides a framework for gathering and organizing spatial data and related information so that it can be displayed and analyzed." (Wade & Sommer, A to Z GIS: An Illustrated Dictionary of Geographic Information Systems (2d ed. 2006) p. 90.) But a 2006 definition of "GIS" does not shed light on what the Legislature meant by the term "computer mapping system" in 1988.

Although the term "computer mapping system" by itself is susceptible of either Sierra Club's or the County's interpretation, we must also consider the statutory context in which the term appears. Section 6254.9(b) refers to "computer mapping systems" as an item "include[d]" in the term "computer software." We agree with Sierra Club that because the statute refers to "computer mapping systems" as a species of "computer software," the term "computer mapping systems" should be construed in light of the meaning of "computer software."

According to Sierra Club, "the plain meaning of the subject term 'software' in subdivision (a) is commonly understood to be distinct from the data upon which the software operates." Dictionary definitions contemporaneous with the 1988 adoption of section 6254.9 tend to support Sierra Club's view. (See Webster's 9th New Collegiate Dict. (1987) p. 1121 [defining "software" as "1 : The entire set of programs, procedures, and related documentation associated with a system and esp. a computer system; *specif* : computer programs . . ."]; 15 Oxford English Dict. (2d ed. 1989) p. 937 [defining "software" as "a. The programs and procedures required to enable a computer to perform a specific task, as opposed to the physical components of the system . . . b. *esp.* The body of system programs, including compilers and library routines, required for the operation

10

of a particular computer and often provided by the manufacturer, as opposed to program material provided by a user for a specific task."]; American Heritage Dict. (3d ed. 1992) p. 1713 [defining "software" as "The programs, routines, and symbolic languages that control the functioning of the hardware and direct its operation . . . ."].)  These definitions of "software" do not encompass user-generated data in a format compatible with specific software.

The Legislature gave a similar meaning to the term "computer software" in 2004 when it enacted Business and Professions Code section 22947.1, subdivision (c), which defines "computer software" as "a sequence of instructions written in any programming language that is executed on a computer."  (Stats. 2004, ch. 843, § 2, p. 6420.)  On the other hand, the Legislature in 1987 — nine months before the adoption of Government Code section 6254.9 — defined "computer program or software" more broadly in the Penal Code to mean "a set of instructions or statements, *and related data*, that when executed in actual or modified form, cause a computer, computer system, or computer network to perform specified functions."  (Pen. Code, § 502, subd. (b)(3), italics added; Stats. 1987, ch. 1499, § 3, p. 5782.)  Thus, although the ordinary meaning of "computer software" tends to support Sierra Club's contention that the term "computer mapping systems" in section 6254.9(b) refers only to mapping software, the Legislature contemporaneously used "computer software" elsewhere to mean not only a program or sequence of instructions but also related data.

Whether the Legislature intended a similarly broad meaning of "computer software" in section 6254.9 is illuminated by considering another feature of the statutory context — namely, section 6254.9(b)'s reference to "computer programs" and "computer graphics systems" in addition to "computer mapping systems" as forms of computer software.  (See § 6254.9(b) ["As used in this section, 'computer software' includes computer mapping systems, computer programs, and computer graphics systems."].)  "[W]hen a statute contains a list or catalogue of items, a court should determine the

11

meaning of each by reference to the others, giving preference to an interpretation that uniformly treats items similar in nature and scope. [Citations.] In accordance with this principle of construction, a court will adopt a restrictive meaning of a listed item if acceptance of a more expansive meaning would make other items in the list unnecessary or redundant, or would otherwise make the item markedly dissimilar to the other items in the list." (*Moore v. California State Bd. of Accountancy* (1992) 2 Cal.4th 999, 1011– 1012.)

The County adopts the Court of Appeal's view that interpreting "computer mapping systems" to encompass only mapping software would make that term superfluous in light of section 6254.9(b)'s inclusion of "computer programs" as a form of computer software. Although this argument is not without force, Sierra Club responds that "one could just as easily argue that 'computer mapping systems' are also 'computer graphics systems[,]' a term that is also used in § 6254.9(b). Thus, even if the term 'computer mapping systems' in § 6254.9(b) was construed to include the data such mapping systems operate upon, the term would remain surplusage."

Further, Sierra Club contends, if a computer mapping system includes not only mapping software but also parcel data in a compatible format, then presumably a computer graphics system would include not only graphics software but also graphics data in a compatible format — a construction that "would arguably exclude from the PRA all computer data operated upon by programs using a graphical interface such as those found on Microsoft Windows or Apple Macintosh computers . . . ." Amicus curiae Electronic Frontier Foundation similarly notes that "computer graphics systems," under the County's reading, would include public databases of mug shots or other images consisting of files (for example, JPEG files) formatted to be viewed and manipulated by graphics software. As a practical matter, such an interpretation would tend to make the mandate in section 6253.9(a)(1) that "[t]he agency shall make the information available in any electronic format in which it holds the information" a virtual nullity or, at least, a

12

limited exception rather than a general rule. Almost all data stored in computers are formatted in some manner to be used with application software. It seems implausible that the Legislature — having expressly stated that "information . . . stored in a computer" is a type of public record subject to disclosure (§ 6254.9(d)) and having provided for access to such information "in any electronic format in which [the agency] holds the information" (§ 6253.9(a)(1)) — would have intended to exclude large categories of computer databases (mapping and graphics) merely because the files they contain are formatted to be read and manipulated by mapping and graphics software.

In sum, the analysis above leads us to conclude that although the term "computer mapping systems" by itself is ambiguous, the ordinary meaning of "computer software" supports Sierra Club's contention that the public records exemption for computer mapping systems covers GIS mapping software but not GIS-formatted data. It is true that the Legislature has elsewhere used the term "computer software" more broadly to include "related data." (Pen. Code, § 502, subd. (b)(3).) But such an interpretation — applied not only to "computer mapping systems" but also in parallel to "computer graphics systems" in section 6254.9(b) — would substantially undermine section 6253.9(a)(1)'s general mandate that "[t]he agency shall make the information available in any electronic format in which it holds the information." Accordingly, we believe the better view, based on statutory text and context, is that GIS-formatted databases are not covered by the statutory exclusion of computer software, including computer mapping systems, from the definition of a public record.

## C.

Although both parties rely on legislative history in support of their respective positions, our review of the history does not reveal anything decisive on the issue before us.

In considering the history of the statutes at issue, we grant the requests of the parties and amici curiae to take judicial notice of legislative history documents for

Assembly Bill No. 3265 (1987–1988 Reg. Sess.), Assembly Bill No. 1293 (1997–1998 Reg. Sess.), Assembly Bill No. 2799 (1999–2000 Reg. Sess.), Assembly Bill No. 1014 (2001–2002 Reg. Sess.), and Assembly Bill No. 1978 (2007–2008 Reg. Sess.); ballot materials concerning Proposition 59 (Gen. Elec. (Nov. 2, 2004)); the American Heritage Dictionary's definition of "program"; and Board of Supervisors of Orange County, Resolution No. 11-196 (Dec. 13, 2011).  We deny Sierra Club's requests to take judicial notice of a "GIS Needs Assessment Study," an excerpt from Ceruzzi, A History of Modern Computing (1998), and a LexisNexis report of amendments to the PRA, as none is the proper subject of judicial notice.

Section 6254.9 was enacted in 1988.  (Stats. 1988, ch. 447, § 1, p. 1836.)  As introduced on February 11, 1988, Assembly Bill No. 3265 (1987–1988 Reg. Sess.) provided in relevant part:  "Nothing in this chapter prohibits an agency from selling proprietary information or requiring a licensing agreement for payment of royalties to the agency prior to any subsequent sale, distribution, or commercial use of the proprietary information by any person receiving the information.  For purposes of this subdivision, 'proprietary information' includes computer readable data bases, computer programs, and computer graphics systems."  (*Id.* at p. 2.)  An amendment changed the term "proprietary information" to "computer software" and added a provision that "[n]othing in this section is intended to affect the public record status of information merely because it is stored in a computer."  (Assem. Bill No. 3265, as amended Apr. 4, 1988, p. 2.)  A Senate amendment replaced the term "computer readable data bases" with "computer mapping systems."  (Sen. Amend. to Assem. Bill No. 3265 (1987–1988 Reg. Sess.) June 9, 1988, p. 2.)

The bill was sponsored by the City of San Jose.  A report by the Assembly Committee on Governmental Organization noted that the city had "developed various computer readable mapping systems, graphics systems, and other computer programs for civic planning purposes.  A number of utility companies, engineering firms, private

14

consultants and other commercial interests are requesting the city's software under the California Public Records Act." (Assem. Com. on Governmental Organization, analysis of Assem. Bill No. 3265 (1987–1988 Reg. Sess.) as amended Apr. 4, 1988, p. 1.) The report further said, "The City is concerned about recouping the cost of developing the software." (*Ibid.*)

The Department of Finance originally opposed the bill, in part because the inclusion of "computer readable data bases" in the definition of "computer software" was contradictory to the intent expressed in the provision of the bill that said "[n]othing in this section is intended to affect the public record status of information merely because it is stored in a computer." (Dept. Finance, analysis of Assem. Bill No. 3265 (1987–1988 Reg. Sess.) as amended Apr. 4, 1988, p. 2.) The Department of Finance dropped its opposition after the Senate amendment on June 9, 1988 changed "computer readable data bases" to "computer mapping systems" and addressed other concerns about the scope of an agency's licensing authority. (Sen. Amend. to Assem. Bill No. 3265 (1987–1988 Reg. Sess. June 9, 1988, p.2; see Dept. Finance, analysis of Assem. Bill No. 3265 (1987–1988) as amended June 15, 1988, p. 1.)

The legislative history reveals no attempt to define "computer mapping system" after the term was introduced by the June 9, 1988 amendment. Instead, various terms were used loosely to explain the scope and effect of the bill. For example, an Assembly report concurring in the final Senate amendments said that the City of San Jose "has developed *computer readable mapping systems*" and that the "city is concerned about recouping the cost of developing the *software*." (Concurrence in Sen. Amends. to Assem. Bill No. 3265 (1987–1988 Reg. Sess.) as amended June 15, 1998, p. 1, italics added.) The same report noted that the bill "draws a distinction between *computer software* and *computer-stored information*" (*id.* at p. 2, italics added), with the latter but not the former constituting a public record. By contrast, the Department of Finance's final fiscal analysis of the bill noted: "The potential revenue generated by the sale of

15

computer programs, graphics, *and information data bases* could be substantial . . . ." (Dept. Finance, analysis of Assem. Bill No. 3265 (1987–1988 Reg. Sess.) as amended June 15, 1988, p. 1, italics added.) Similarly, a Republican analysis for the Assembly Committee on Governmental Organization stated that the final amended bill would "allow agencies to recover development and maintenance costs of computer software by selling or licensing computer programs *and data bases* that have been developed sometimes at considerable public expense." (Assem. Republican Caucus, analysis of Assem. Bill No. 3265 (1987–1988 Reg. Sess.) as amended June 15, 1988, p. 1, italics added.)

The Court of Appeal's decision below relied on the fact that the City of San Jose originally proposed the bill to include "computer readable data bases" to suggest that the bill was intended to reach databases like the OC Landbase. The Court of Appeal noted that the legislative file of the Senate Committee on Governmental Organization included a memorandum from the city, which stated: "The City of San Jose, like many other government agencies[,] has developed various computer readable data bases, computer programs, computer graphics systems and other computer stored information at considerable research and development expense. For example, the City's Department of Public Works has recently completed development of a data base for a computer mapping system known as the Automated Mapping System (AMS). [¶] The AMS is the product of eight years of efforts on the part of Public Works to collect and store on computer magnetic tape, city wide information regarding the location of public improvements and natural features. This wide range of data can be arranged in various ways to produce many types of maps for specialized uses, such as fire response, sewer collection, or police beat maps. Public Works estimates that development costs to date have exceeded $2 million dollars." (City Atty. Joan R. Gallo, City of San Jose mem. (Jan. 19, 1988) [legislative proposal for authority to sell or license proprietary information].)

16

It may be that the City of San Jose intended the bill to exclude "computer readable data bases" from the definition of a public record. However, " '[i]n construing a statute we do not consider the objective of an authoring legislator when there is no reliable indication that the Legislature as a whole was aware of that objective and believed the language of the proposal would accomplish it.' " (*People v. Garcia* (2002) 28 Cal.4th 1166, 1175–1176, fn. 5.) The City of San Jose's memorandum is not such a "reliable indication." Moreover, we decline to place great weight on the city's intent since the Legislature subsequently amended the bill to specifically remove the city's proposed reference to "computer readable data bases." Ultimately, the legislative history does not clearly indicate whether the replacement term "computer mapping systems" was intended to eliminate the exclusion for "computer readable data bases" of all kinds or to narrow the exclusion so that it would cover databases compatible with computer mapping systems but not other databases.

In sum, the legislative history of section 6254.9 reveals a significant change in the scope of the bill from the time it was introduced in February 1988 until it was enacted in June 1988. The legislation evolved from a bill solely concerned with allowing agencies to recoup the cost of developing proprietary information to a statute that balanced such concerns with a general intent to maintain the public record status of electronically stored information. The broad terms "proprietary information" and "computer readable data bases" were replaced with the narrower terms "computer software" and "computer mapping systems," respectively. And a separate section was added to clarify that the statute was not intended to exclude information from the definition of a public record simply because it is stored in a computer. Although the trajectory of the bill appears to recognize a general distinction between software and data, the legislative history does not speak to the particular data at issue here: a database with format characteristics specific to computer mapping systems. In the end, it is unclear whether the Legislature intended the term "computer mapping systems" to exclude both mapping software and parcel data

17

in a system-compatible format from the definition of a public record, or to remove all "computer readable data bases" from the ambit of the exclusion.

Nor does the Legislature's 2000 addition of section 6253.9, which specifically governs the disclosure of electronic records, help to resolve the matter. (See Stats. 2000, ch. 982, § 2, p. 7142, added by Assem. Bill No. 2799 (1999–2000 Reg. Sess.) (Assembly Bill 2799).) As noted, section 6253.9(a) says: "Unless otherwise prohibited by law, any agency that has information that constitutes an identifiable public record not exempt from disclosure pursuant to this chapter that is in an electronic format shall make that information available in an electronic format when requested by any person . . . ." Assembly Bill 2799 was sponsored by the California Newspaper Publishers Association "to ensure quicker, more useful access to public records." (Assem. Com. on Governmental Organization, analysis of Assem. Bill No. 2799 (1999–2000 Reg. Sess.) as introduced Feb. 28, 2000, p. 2.) As originally introduced, the bill did not specify that it applied only to electronic records already subject to disclosure under the PRA, prompting opposition from various public entities intent on preserving the exclusion for "proprietary software" in section 6254.9(a). (Sen. Com. on Judiciary, analysis of Assem. Bill No.2799 (1999–2000 Reg. Sess.) as amended June 22, 2000, p. 10 (Senate Analysis).) This concern was remedied through amendments clarifying that the bill applied only to information otherwise subject to disclosure. (*Ibid.*) In particular, the Senate Judiciary Committee noted that Assembly Bill 2799 as amended allows agencies to reject any request that would require an agency to release proprietary software along with the requested records. (Sen. Analysis, p. 5.)

Meanwhile, other agencies expressed concern that because the bill would require electronic disclosure of "massive databases," it would require significant amounts of staff time to redact nondisclosable information and would increase the risk of unintentional release of nondisclosable information when compared with nonelectronic production. (Assem. Com. on Governmental Organization, analysis of Assem. Bill No. 2799 (1999–

18

2000 Reg. Sess.) as amended Apr. 27, 2000, pp. 2–3.) The Legislature does not appear to have adopted any amendments in response to this concern, and documents in the Governor's Chaptered Bill File suggest that these concerns remained in effect through the final enrolled bill. (See, e.g., Dept. Information & Technology, Enrolled Bill Rep. on Assem. Bill No. 2799 (1999–2000 Reg. Sess.) Sept. 25, 2000, p. 2.)

As with section 6254.9, the legislative history of section 6253.9 reveals no clear answer to the question before us. On one hand, we can infer that the Legislature recognized a distinction between software and data, since it amended Assembly Bill 2799 to protect proprietary software while rejecting agency concerns that the disclosure of databases in an electronic format might require significant staff time. On the other hand, even if the Legislature adopted section 6253.9 on the premise that electronic databases are generally subject to disclosure, it does not follow that a GIS-formatted database, in particular, is also subject to disclosure in light of section 6254.9(b)'s exclusion of "computer mapping systems" from the definition of a public record.

Because legislative history is inconclusive on the question presented, our review of the history does not alter the conclusion we previously reached. Considering the relevant terms of section 6254.9 by themselves and in their statutory context, we believe the public records exemption for "[c]omputer software" (§ 6254.9(a)), a term that "includes computer mapping systems" (§ 6254.9(b)), does not cover GIS-formatted databases like the OC Landbase at issue here.

**D.**

Any remaining doubt about the proper interpretation of section 6254.9 in this case is dispelled by the interpretive rule in article I, section 3, subdivision (b)(2), of the California Constitution: "A statute, court rule, or other authority, including those in effect on the effective date of this subdivision, shall be broadly construed if it furthers the people's right of access, and narrowly construed if it limits the right of access."

19

To the extent that the term "computer mapping system" is ambiguous, the constitutional canon requires us to interpret it in a way that maximizes the public's access to information " 'unless the Legislature has *expressly* provided to the contrary.' " (*Office of Inspector General v. Superior Court*, *supra*, 189 Cal.App.4th at p. 709.) As explained above, we find nothing in the text, statutory context, or legislative history of the term "computer mapping system" that allows us to say the Legislature clearly sought to exclude GIS-formatted parcel data from the definition of a public record when it can be disclosed without any accompanying software. Applying the interpretive rule set forth in article I, section 3, subdivision (b)(2), we must conclude that section 6254.9(b)'s exclusion of "computer mapping systems" from the definition of a public record does not encompass a parcel database in a GIS file format. Contrary to what the County contends, this reading of the statute does not "repeal or nullify" a "statutory exception to the right of access to public records" in contravention of article I, section 3, subdivision (b)(5). Our holding simply construes the terms of section 6254.9 in light of the constitutional mandate that a statute "shall be . . . narrowly construed if it limits the right of access." (Cal. Const., art. I, § 3, subd. (b)(2).)

We note that this interpretation is consistent with a 2005 opinion letter issued by the Attorney General in response to a request by a member of the Assembly to determine whether "parcel boundary map data maintained in an electronic format by a county assessor [is] subject to public inspection and copying under provisions of the California Public Records Act[.]" (88 Ops.Cal.Atty.Gen. 153, 153 (2005).) The opinion letter explained that "the term 'computer mapping systems' in section 6254.9 does not refer to or include basic maps and boundary information per se (i.e., the basic *data* compiled, updated, and maintained by county assessors), but rather denotes unique computer *programs* to process such data using mapping functions — original programs that have been designed and produced by a public agency." (88 Ops.Cal.Atty.Gen. at p. 159.) "Accordingly," the Attorney General concluded, "parcel map data maintained in an

20

electronic format by a county assessor does not qualify as a 'computer mapping system' under the exemption provisions of section 6254.9" (88 Ops.Cal.Atty.Gen. at p. 159) and must be provided upon request as a public record at a fee limited to the direct cost of producing the copy (*id.* at pp. 163–164). As noted above, the record here indicates that 47 counties in California maintain GIS-formatted parcel base maps and provide access to those GIS-formatted databases as public records. (*Ante*, at p. 3.) Of those 47 counties, 19 changed their fee policies following the Attorney General's opinion letter, according to Sierra Club's expert.

Because section 6254.9(b) does not exclude GIS-formatted databases like the OC Landbase from the definition of a public record, such databases are subject to disclosure unless otherwise exempt from the PRA. Unlike the records at issue in *County of Santa Clara v. Superior Court* (2009) 170 Cal.App.4th 1301, the County here does not argue that the OC Landbase is subject to any other exemptions. The fact that the County offered to produce the information underlying the database in an alternative format suggests that no such exemption applies. Similarly, the County's general practice of producing the OC Landbase to the public, albeit pursuant to a licensing agreement, suggests that its contents do not implicate any of the confidentiality or other concerns underlying the exemptions set forth in section 6254. Because the OC Landbase is not excluded from the definition of a public record under section 6254.9(b), and because the County does not argue that the database is otherwise exempt from disclosure, the County must produce the OC Landbase in response to Sierra Club's request "in any electronic format in which it holds the information" (§ 6253.9(a)(1)) at a cost not to exceed the direct cost of duplication (§§ 6253.9(a)(2), 6253, subd. (b)).

## CONCLUSION

For the reasons above, we reverse the judgment of the Court of Appeal and remand to that court with directions to remand to the superior court to issue a writ consistent with this opinion.


LIU, J.


WE CONCUR:   CANTIL-SAKAUYE, C. J.
                KENNARD, J.
                BAXTER, J.
                WERDEGAR, J.
                CHIN, J.
                CORRIGAN, J.

*See last page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Sierra Club v. Superior Court

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 195 Cal.App.4th 1537
**Rehearing Granted**

_____

**Opinion No.** S194708
**Date Filed:** July 8, 2013

_____

**Court:** Superior
**County:** Orange
**Judge:** James Di Cesare

_____

**Counsel:**

Venkus & Associates, Sabrina D. Venkus and Dean Wallraff for Petitioner.

Holme Roberts & Owen, Bryan Cave, Rachel Matteo-Boehm, Katherine Keating and Leila Knox for Media and Open Government, First Amendment Coalition, Freedom Communications, Inc., Publisher of the Orange County Register, Los Angeles Times Communications LLC, The Associated Press, Bay Area News Group, Bloomberg News, Courthouse News Service, Gannett Co., Inc., Hearst Corporation, Lee Enterprises, Incorporated, The McClatchy Company, Patch Media Corporation, The San Francisco Examiner, Wired, American Society of News Editors, Association of Capitol Reporters and Editors, California Newspaper Publishers Association, Digital Media Law Project, Citizen Media Law Project, Electronic Frontier Foundation, First Amendment Coalition of Arizona, National Freedom of Information Coalition, Openthegovernment.org, The Reporters Committee for Freedom of the Press and Society of Professional Journalists as Amici Curiae on behalf of Petitioner.

M. Rhead Enion for Academic Researchers in Public Health, Urban Planning and Environmental Justice as Amici Curiae on behalf of Petitioner.

Jack Cohen as Amicus Curiae on behalf of Petitioner.

Otten & Joyce, Victor J. Otten and Brigid Joyce for 212 GIS Professionals and 23 GIS Organizations as Amici Curiae on behalf of Petitioner.

Meyer, Klipper & Mohr, Christopher A. Mohr, Michael R. Klipper, Colby F. Block; Coblentz, Patch, Duffy & Bass, Jeffrey G. Knowles and Julia D. Greer for Consumer Data Industry Association, Corelogic, LexisNexis, The National Association of Professional Background Screeners and the Software & Information Industry Association as Amici Curiae on behalf of Petitioner.

Stanford Environmental Law Clinic, Deborah A. Sivas, Alicia E. Thesing, Leah J. Russin, Matthew H. Armsby and Margaret Brennan for Advocates for the Environment as Amicus Curiae on behalf of Petitioner.

**Counsel:**

Mark Rumold for Electronic Frontier Foundation as Amici Curiae on behalf of Petitioner.

Michel & Associates and C. D. Michel for the Geographic Information Systems Community as Amici Curiae on behalf of Petitioner.

Law Offices of Michael W. Stamp, Michael W. Stamp and Molly Erickson for The Open Monterey Project as Amicus Curiae on behalf of Petitioner.

No appearance for Respondent.

Nicholas S. Chrisos, County Counsel, Mark D. Servino, Rebecca S. Leeds and Karen L. Christensen, Deputy County Counsel, for Real Party in Interest.

Richards, Watson & Gershon and Ginetta L. Giovinco for California Assessors' Association as Amicus Curiae on Behalf of Real Party in Interest.

Best Best & Krieger, Shawn Hagerty and Rebecca Andrews for League of California Cities and California State Association of Counties as Amici Curiae on Behalf of Real Party in Interest.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Sabrina D. Venkus
Venkus & Associates
21 South California Street, Suite 204
Ventura, CA  93001
(805) 641-0247

Mark D. Servino
Deputy County Counsel
333 West Santa Ana Boulevard, Suite 407
Santa Ana, CA  92701
(714) 834-3300