Filed 1/14/14 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>     Petitioner,<br><br>v.<br><br>SUPERIOR COURT OF THE STATE OF CALIFORNIA, COUNTY OF ALAMEDA,<br><br>     Respondent,<br><br>REUTERS AMERICA LLC,<br><br>     Real Party in Interest. | A138136<br><br>(Alameda County<br>Super. Ct. No. RG12-613664)<br><br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br>[NO CHANGE IN JUDGMENT] |

BY THE COURT:

It is ordered that the opinion filed herein on December 19, 2013, be modified as follows: The final sentence on page 28 ("The Regents shall recover its costs.") is deleted.

There is no change in the judgment. Real Party in Interest's petition for rehearing is denied.


Dated: _____        _____

                                                              Kline, P.J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>      Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF ALAMEDA COUNTY,<br><br>      Respondent;<br><br><br>REUTERS AMERICA LLC,<br><br>      Real Party in Interest. | A138136<br><br>(Alameda County<br>Super. Ct. No. RG12-613664) |

The primary issue in this case is whether a public agency can be required under the California Public Records Act (Gov. Code, § 6250 et seq.)[1] (the Act or the CPRA) to seek records it does not prepare, own, use or retain in the conduct of its business.  Real Party in Interest Reuters America LLC (Reuters) filed a petition for writ of mandate in the superior court under the CPRA requesting individual fund information for investments made by the Regents of the University of California (the Regents).[2]  The superior court granted the writ and found that the Regents was required to use "objectively reasonable efforts" to obtain from Kleiner Perkins Caulfield & Byers (Kleiner Perkins) and Sequoia Capital (Sequoia) individual fund information for the Regents's current investments even though the Regents had not prepared, owned, used, or

_____

[1]  All further unspecified code sections refer to the Government Code.

[2]  "Regents" is used as a singular noun in the record and in the Regents's briefing, so we adopt the same convention.

1

retained this fund information. The trial court also ordered certain information lodged conditionally under seal with the trial court pursuant to California Rules of Court, rule 2.551, as part of the Regents's opposition to the writ petition under the CPRA, be deemed public rather than returned to the Regents. The Regents seeks a writ of mandate and/or prohibition in this court directing the trial court to set aside the trial court order. We stayed the trial court's order and issued an order to show cause.

With respect to the first issue, the Regents concedes that the information sought relates to the public's business. Nonetheless, because it was not prepared, owned, used, or retained by the Regents, we hold that records reflecting such information in the hands of Kleiner Perkins and Sequoia are not "[p]ublic records" within the meaning of the CPRA, section 6252, subdivision (e).[3] With respect to the second issue, we hold that the trial court's decision to defer ruling on the Regents's motions to seal until deciding the merits of Reuters' petition, and consideration of that evidence, did not relieve the trial court of its obligation to return the lodged records, as required by California Rules of Court, rule 2.551(b)(6), upon final conclusion of the case. We accordingly grant the Regents's petition.

## BACKGROUND

As of October 2012, when this matter was initially heard in the trial court, the Regents owned investment assets of about $71.6 billion, which help pay for employee pensions, student scholarships, research, and other university operations. The Regents sets broad policies; management of the assets is entrusted to the Office of Treasurer with assistance from the consulting firm Cambridge Associates and oversight from the Regents's Committee on Investments and a separate investment advisory committee.

Since 1979, about two percent of the Regents's multi-billion dollar investment portfolio has been invested in "private equity," which refers to limited partnerships

---

[3] Section 6252 provides, in relevant part: "As used in this chapter: [¶] . . . [¶] (e) 'Public records' includes any writing containing information relating to the conduct of the public's business prepared, owned, used, or retained by any state or local agency regardless of physical form or characteristics."

2

formed and managed by private parties to invest in private companies (sometimes referred to as "funds"). The companies that form funds are often referred to as "private equity firms"; those that focus on start-ups are often referred to as "venture capital firms" or "VCs."

Until 2003, the Regents received from private equity firms, including Kleiner Perkins and Sequoia, information that enabled it to monitor its private equity investments. This information consisted of annual fund level information, which included information on portfolio companies, i.e., privately held companies in which the fund invested, the amounts of those investments, and other information the private equity firms regarded as confidential business information. Such information was provided to investors like the Regents in confidence.

In 2003, however, the Alameda County Superior Court decided *Coalition of University Employees v. The Regents of the University of California* (Super. Ct. Alameda County, 2003, No. RG03-089302) (*CUE*). In *CUE*, the Regents defended against a CPRA request for, among other things, the internal rate of return for 94 separate private equity funds, by arguing that the information should be treated as exempt from disclosure under the CPRA as trade secrets or as official information. The Regents also argued that pursuant to section 6255 it was justified in withholding the information because the public interest served by not disclosing the records clearly outweighed the public interest served by disclosure. The trial court held that the Regents's evidence in support of those arguments was insufficient for it to carry its burden of showing why the records should not be produced. This court summarily denied the Regents's petition seeking review of the *CUE* decision and the Supreme Court denied a hearing. Importantly for the present case, in *CUE* there was no dispute that the records requested met the definition of "public records." (*CUE,* at p. 122. )

Following the *CUE* decision Kleiner Perkins stopped providing the Regents with fund specific information for its existing investments and stopped inviting the Regents to participate in new funds. Sequoia did the same until 2010 when it allowed the Regents to

invest in Sequoia Capital 2010 LP.[4]  So far as the record shows, no further CPRA requests were sent to the Regents seeking alternative investment information until 2012, when the request that led to this litigation was sent.

In the meantime, "[i]n 2004, California voters approved Proposition 59, which amended the state Constitution to provide a right of access to public records. . . . [A]rticle I, section 3, subdivision (b)(1) provides:  'The people have the right of access to information concerning the conduct of the people's business, and therefore, the meetings of public bodies and the writings of public officials and agencies shall be open to public scrutiny.'  Subdivision (b)(2) provides guidance on the proper construction of statutes affecting this right of access:  'A statute, court rule, or other authority, including those in effect on the effective date of this subdivision, shall be broadly construed if it furthers the people's right of access, and narrowly construed if it limits the right of access.' "  (*Sierra Club v. Superior Court* (2013) 57 Cal.4th 157, 166 (*Sierra Club*).)

The following year, the Legislature added an additional exemption specifically relating to alternative investments in which public investment funds invest to more than two dozen exemptions already set forth at section 6254 et seq.  Section 6254.26 now provides:

"(a)  Notwithstanding any provision of this chapter or other law, the following records regarding alternative investments in which public investment funds invest shall not be subject to disclosure pursuant to this chapter, unless the information has already been publicly released by the keeper of the information:

"(1)  Due diligence materials that are proprietary to the public investment fund or the alternative investment vehicle.

---

[4]  Sequoia's explanation for excluding the Regents is summarized in excerpts of an August 2003 letter quoted in the petition at paragraph 16.  Although Sequoia did allow the Regents to participate in Sequoia Capital 2010 LP, the offering memorandum for that new fund apparently included the fund specific information since 2003, which Reuters has sought in this action, at least through 2009.  The Regents believes that information was provided to it by Sequoia in error.  Nonetheless, after consulting with Sequoia, the Regents produced the information to Reuters, which promptly published it.  Sequoia then resumed its policy of excluding the Regents from other new funds.

"(2)  Quarterly and annual financial statements of alternative investment vehicles.

"(3)  Meeting materials of alternative investment vehicles.

"(4)  Records containing information regarding the portfolio positions in which alternative investment funds invest.

"(5)  Capital call and distribution notices.

"(6)  Alternative investment agreements and all related documents.

"(b)  Notwithstanding subdivision (a), the following information contained in records described in subdivision (a) regarding alternative investments in which public investment funds invest shall be subject to disclosure pursuant to this chapter and shall not be considered a trade secret exempt from disclosure:

"(1)  The name, address, and vintage year of each alternative investment vehicle.

"(2)  The dollar amount of the commitment made to each alternative investment vehicle by the public investment fund since inception.

"(3)  The dollar amount of cash contributions made by the public investment fund to each alternative investment vehicle since inception.

"(4)  The dollar amount, on a fiscal yearend basis, of cash distributions received by the public investment fund from each alternative investment vehicle.

"(5)  The dollar amount, on a fiscal yearend basis, of cash distributions received by the public investment fund plus remaining value of partnership assets attributable to the public investment fund's investment in each alternative investment vehicle.

"(6)  The net internal rate of return of each alternative investment vehicle since inception.

"(7)  The investment multiple of each alternative investment vehicle since inception.

"(8)  The dollar amount of the total management fees and costs paid on an annual fiscal yearend basis, by the public investment fund to each alternative investment vehicle.

"(9)  The dollar amount of cash profit received by public investment funds from each alternative investment vehicle on a fiscal year-end basis.

"(c)  For purposes of this section, the following definitions shall apply:

5

"(1)  'Alternative investment' means an investment in a private equity fund, venture fund, hedge fund, or absolute return fund.

"(2)  'Alternative investment vehicle' means the limited partnership, limited liability company, or similar legal structure through which the public investment fund invests in portfolio companies.

" (3)  'Portfolio positions' means individual portfolio investments made by the alternative investment vehicles.

"(4)  'Public investment fund' means any public pension or retirement system, and any public endowment or foundation."

Section 6254.26 was introduced at the behest of, among others, the Regents.  It was introduced as section 2 of 2005 Statutes, chapter 258 (Sen. Bill No. 439).[5]

_____

[5]  In light of the parties' arguments concerning the import of section 6254.26, discussed below, section 1 of Senate Bill No. 439 bears quotation in full:

"The Legislature finds and declares that Section 2 of this act, which adds Section 6254.26 of the Government Code, imposes a limitation on the public's right of access to the meetings of public bodies or the writings of public officials and agencies within the meaning of Section 3 of Article I of the California Constitution.  Pursuant to that constitutional provision, the Legislature makes the following findings to demonstrate the interest protected by this limitation and the need for protecting that interest:

"(a)  Access to information concerning the conduct of the people's business is a fundamental and necessary right of every person in this state pursuant to subdivision (b) of Section 3 of Article I of the California Constitution and Section 6250 of the Government Code.  The public has a paramount interest in knowing how public money is spent and invested.

"(b)  Public pension and retirement systems and public endowments and foundations have a fiduciary duty to invest the assets of these funds with care, skill, prudence, and diligence.  This fiduciary duty includes diversifying the investment of assets in a manner so as to minimize the risk of loss and maximize the rate of return.  Investment in high performing alternative investments is a component of diversifying the pension assets and maximizing the rate of return.

"(c)  At the same time, a certain narrow class of public investments, alternative investments, involves some information that historically has been kept confidential because confidentiality is essential to their success.  The disclosure of certain information pertaining to alternative investments could be harmful to generating sustainable and profitable rates of return for the investments of the pension or retirement system and of

The current litigation was foreshadowed by Reuters' September 20, 2011 email to Marie Berggren, Chief Investment Officer and Acting Treasurer of the Regents. In that email Mark Boslet, Senior Editor of Venture Capital Journal/peHUB (a Thomson Reuters Publication), requested various kinds of financial information pertaining to all of the Regents's investments with Kleiner Perkins, Sequoia, and Accel Partners.[6] After exchanges of email correspondence in which the Regents made clear that it had no individual fund data for Kleiner Perkins, Sequoia, or Accel, the Regents on November 1, 2012, referred Reuters to its website for information it had already made publicly available showing the names of the individual funds, the vintage year, the University of

_____

the public endowment or foundation. Public pension systems desire to invest a portion of their portfolio in alternative investments to boost return.

"(d) Following recent litigation seeking to require public pension funds and retirement systems and public endowments or foundations to disclose certain information about alternative investments, the funds risk being excluded from participation in certain alternative investments. Exclusion from investing pension or retirement system assets in alternative investments may impose substantial costs on state public pension funds and the public employees who are their beneficiaries.

"(e) It is the intent of this legislation to balance the public's right of access to information and the ability of public pension funds to continue to invest in alternative investment funds. It is also the intent of this legislation to allow the public to monitor the performance of public investments; for public bodies to avoid payment of excessive fees to private individuals or companies; and for the public to be able to know the principals involved in management of alternative investment funds in which public investment funds have invested so that conflicts of interest on the part of public officials can be avoided. This legislation is not intended to reverse the general presumption of access and openness of the California Public Records Act and subdivision (b) of Section 3 of Article I of the California Constitution.

"(f) It is not the intent of this legislation to overrule or invalidate any court orders in or stipulated resolutions of prior litigation relating to any public entity's obligation to disclose information about its alternative investments to narrow the information disclosed as a result of those decisions, or in any other way to apply retroactively. It is, rather, the intent of this legislation to establish predictability about what should and should not be disclosed regarding private equity funds so that public pension funds will be able to continue to invest in private equity funds." (Stats. 2005, ch. 258, § 1, pp. 2617-2618.)

[6] The request with respect to Accel information was resolved prior to the hearing in the trial court.

7

California commitment, cash in, current net asset value (NAV), cash out, cash out plus NAV, investment multiple, and, where available, the net internal rate of return (IRR). The Regents also provided aggregate numbers for drawdowns, distributions, and NAV for the Sequoia, KP, and Accel funds on an aggregate basis. Other than some Sequoia individual fund information inadvertently provided by Sequoia to the Regents, and then produced to Reuters, the Regents did not have individual fund information for those VCs after 2003. Correspondence between the attorneys followed with Reuters limiting its requests to specific fund information for all Kleiner Perkins and Sequoia funds.

## PROCEDURAL HISTORY

Reuters filed its original petition in the Superior Court for Alameda County on January 23, 2012. On March 26, 2012, Reuters filed a first amended petition, which became the operative pleading in the trial court. In addition to repeating its request for fund specific information reflected in its first CPRA request, Reuters attached a March 14, 2012 second CPRA request for other information. That request was resolved by the trial court and is not pertinent to this proceeding.

The first amended petition also attached the information described above from the Regents's Treasurer's website with information on alternative investments on a fund-by-fund basis, where available, as of June 30, 2011. The summary table provided shows that the Regents had investments with Kleiner Perkins in five funds; each investment involved a commitment made between 1992 and 2000 of $15 million or $20 million. Rates of return on those investments (albeit not fully closed out) ranged from a high of 286.6 percent for Kleiner Perkins's 1996 Fund VIII to a low of -17.5 percent for its 2000 Fund X-A LP. The Regents also had investments with Sequoia, four of which were made between 1998 and 2000, and one of which was made in 2010. Each involved a commitment of between $16 million and $30 million. For the four earlier funds, the best reported IRR was 90 percent for Sequoia VIII made in 1998, and the worst was -31 percent for Sequoia X made in 2000.

The parties filed extensive briefs and declarations in the trial court. On September 10, 2012, the Regents filed a motion pursuant to California Rules of Court, rule 2.551, to

8

seal certain documents lodged by Reuters. It filed a second motion to seal on September 14, 2012. The Regents requested that certain documents it had lodged in support of its opposition to Reuters' motion be sealed. It filed a third motion to seal on October 12, 2012, regarding documents lodged by Reuters in support of its reply papers.

On October 19, 2012, the trial court provided the parties, but not the public, with a tentative ruling on Reuters' petition and the Regents's motions to seal. The court heard argument, portions of which were made out of the presence of the public. The parties were directed to meet and confer with respect to the court's proposed treatment of the conditionally sealed documents and to consider whether the tentative ruling would be filed in the register of actions.[7] Supplemental briefing addressed primarily to the pending motions to seal was allowed and received. The Regents filed a fourth motion to seal on December 3, 2012.

Per the agreed-upon schedule, the parties returned for further argument on the petition and the motions to seal on December 7, 2012. At the hearing, the Regents referred the court to rule 2.551(b)(6) of the California Rules of Court, and explained that when the trial court denies a motion to seal, the moving party decides whether to file a document to avoid public disclosure. The court responded that the present situation was unusual because the court was granting the motion in part and denying it in part but it understood both the Regent's position and "what the rule says on its face."

On February 4, 2013, the court filed its 35-page order. As is pertinent here, the court granted in part Reuters' writ petition with respect to individual fund level information and denied in part the Regents's motions to seal. With respect to individual fund information, the court found on the evidence before it that the Regents "does not directly 'own' or 'retain' post-2003 Fund Level Information concerning investments with Sequoia and Kleiner Perkins. . . . [¶] The Regents has demonstrated that it has not 'used' Fund Level Information directly. . . . [¶] The Regents has not, however, demonstrated

---

[7] In the Alameda County Superior Court, documents filed in the register of actions for civil cases are routinely imaged and available to the public on the court's Domain website. Documents conditionally lodged and later filed under seal are not.

that the Fund Level Information does not relate to the conduct of the people's business or that it does not have constructive possession of that information."

The order also addressed the motions to seal and stated that the court had applied "the [CPRA] framework for [*sic*] when deciding whether to seal filed documents under [California Rules of Court, rule] 2.550 without regard to whether the documents or information are the subject of the [CPRA] claims." The court applied that framework to a detailed review of redacted portions of the parties' briefs and declarations, as well as to documents the Regents had provided to Reuters during discovery, or with the moving papers, pursuant to a stipulated order regarding confidentiality. With the exception of those documents identified on exhibit B to its order that the court determined were exempt from disclosure under the CPRA, the court ruled that "[t]he Regents must file public versions of all documents now conditionally under seal with exclusions or redactions only as permitted by" the court's order.

After receiving Reuters' proposed judgment and writ, the Regents's objections, and Reuters' response, on February 19, 2013, the court filed its judgment and order on the judgment and writ, and motions to seal. With respect to the documents subject to the motions to seal, the court denied the Regents's request to have the clerk return the unredacted documents lodged by the Regents and not place them in the file. The court stated: "[California Rules of Court], rule 2.551(b)(6) implicitly presumes that a party can obtain the return of a lodged document before the court or the trier of fact considers the document. . . . In this case, however, the Regents is seeking the right to retrieve its lodged documents after the court has considered the documents in resolving the merits of the Petition. [¶] The court will not permit the Regents to seek the return of documents that the court has considered in resolving the merits of the petition. The court relied on all the information submitted by the Regents in opposing the petition. Having submitted evidence to the court and obtained a resolution of the motion on its merits, the Regents is judicially estopped from retrieving evidence from the court file. A party would interfere with 'the orderly administration of justice and regard for the dignity of judicial proceedings' if it submitted evidence, obtained a decision based on that evidence, and

10

then sought to remove the evidence from the court file.  ([*The*] *Swahn Group, Inc. v. Segal*  (2010) 183 Cal.App.4th 831, 841.)"  (Fn. omitted.)

On March 6, 2013, the Regents filed a notice of appeal from the February 4, 2013 order.  On March 21, 2013, the Regents filed a petition for writ of mandate in this court and requested a stay.[8]  We granted a temporary stay.  In April, the Regents filed its exhibits, and filed some exhibits under seal pursuant to California Rules of Court, rule 8.46(c).  On May 10, 2013, we granted the application of the League of California Cities for leave to file an amicus curiae letter brief in support of the Regents.  Reuters filed its response to the letter brief on May 17, 2013.  Reuters filed a motion to dismiss the appeal, which we granted on May 29, 2013.  On this same date, May 29, we ordered Reuters to show cause why the relief requested in the Regents's petition should not be granted.

## DISCUSSION

### I. *The Records Reuters Seeks Are Not "Public Records" Under the CPRA*

At the outset it is important to understand what we are and are not deciding. Initially, we are not deciding whether it is wise for the Regents to diversify its portfolio by investing about two percent of its assets in alternative investments, including venture capital funds.  Nor are we deciding whether the Regents receives sufficient information from the VCs with which it seeks to invest, including Kleiner Perkins and Sequoia, to perform its fiduciary obligation of monitoring its venture capital investments.[9]  Nor are we deciding whether it is reasonable for Kleiner Perkins and Sequoia, unlike many other venture fund operators, to refuse to do additional business with the Regents, or to limit the information they provide to the Regents with respect to its existing investments, because of the Regents' CPRA obligation to respond appropriately to requests for public

---

[8]  The trial court's order directing disclosure under the CPRA is "immediately reviewable by petition to the appellate court for the issuance of an extraordinary writ." (§ 6259, subd. (c).)

[9]  The court notes that the Regents obtains detailed information with respect to each fund's portfolio companies and other information, which is exempt from disclosure under the Act, section 6254.26, subdivision (a)(1)-(4), and is not at issue in this case.

11

records pertaining to investments made with those companies.  It is undisputed that Kleiner Perkins and Sequoia are private companies, not public agencies engaged in the public's business.

What we are deciding in this case is whether the individual fund information which the trial court has ordered the Regents to make objectively reasonable efforts to obtain from Kleiner Perkins and Sequoia constitutes "public records" within the meaning of the Act.  The trial court found that the Act requires the Regents to produce records pertaining to the public's business which may be in its constructive possession.  The Regents contends that this interpretation is incorrect and contrary to the plain words of the statute.

Since the issue in this writ is the correct interpretation of the Act, we are guided in this endeavor by established rules of statutory interpretation as recently restated and applied in the context of the CPRA by our Supreme Court:  "When we interpret a statute, '[o]ur fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose.  We first examine the statutory language, giving it a plain and commonsense meaning.  We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment.  If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend.  If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy.'  (*Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737 . . . .)  'Furthermore, we consider portions of a statute in the context of the entire statute and the statutory scheme of which it is a part, giving significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose.' "  (*Curle v. Superior Court* (2001) 24 Cal.4th 1057, 1063 . . . .)"  (*Sierra Club*, *supra*, 57 Cal.4th at pp. 165-166.)  Although our review of the statutory scheme is de novo, we must proceed "according the usual deference to any express or implied factual findings of the superior court supported by substantial

12

evidence." (*Connell v. Superior Court* (1997) 56 Cal.App.4th 601, 612.) Here, the issue before us concerns the construction of the statute, not factual findings; thus, we apply de novo review.

"In this case, our usual approach to statutory construction is supplemented by a rule of interpretation that is specific to the issue before us. In 2004, California voters approved Proposition 59, which amended the state Constitution to provide a right of access to public records. . . . [A]rticle I, section 3, subdivision (b)(1) provides: 'The people have the right of access to information concerning the conduct of the people's business, and therefore, the meetings of public bodies and the writings of public officials and agencies shall be open to public scrutiny.' Subdivision (b)(2) provides guidance on the proper construction of statutes affecting this right of access: 'A statute, court rule, or other authority, including those in effect on the effective date of this subdivision, shall be broadly construed if it furthers the people's right of access, and narrowly construed if it limits the right of access. . . .' In addition, subdivision (b)(5) provides: 'This subdivision does not repeal or nullify, expressly or by implication, any constitutional or statutory exception to the right of access to public records or meetings of public bodies that is in effect on the effective date of this subdivision, including, but not limited to, any statute protecting the confidentiality of law enforcement and prosecution records.' (Cal. Const., art. I, § 3, subd. (b).) " (*Sierra Club*, *supra*, 57 Cal.4th at p. 166.)

Applying the prescribed approach to this case we begin with the language of the Act.[10] Section 6252 provides definitions to be "used in this chapter." Subdivision (e)

---

[10] Reuters argues that we must affirm if substantial evidence supports the trial court's "implied factual" finding that the Regents has constructive possession of the Kleiner Perkins or Sequoia fund-specific records. This is incorrect. The trial court made no actual or implied finding regarding the Regents' constructive possession of any particular document. The trial court interpreted the CPRA to include constructive possession in the definition of public records under section 6252, subdivision (e), but made no specific ruling as to whether any particular document is constructively possessed by the Regents. To the contrary, the court ordered the Regents to make "an objectively reasonable effort to obtain Fund Level Information responsive to the September 20, 2011 request."

13

defines " '[p]ublic records' " to include "any writing containing information relating to the conduct of the public's business prepared, owned, used, or retained by any state or local agency regardless of physical form or characteristics." (§ 6252, subd. (e).) The trial court acknowledged that "[t]he Regents has demonstrated that it did not directly 'prepare' and does not directly 'own' or 'retain' post-2003 Fund Level Information concerning investments with Sequoia and Kleiner Perkins. . . . [¶] The Regents has demonstrated that it has not 'used' Fund Level Information directly. . . . [¶] The Regents has not, however, demonstrated that the Fund Level Information does not relate to the conduct of the people's business or that it does not have constructive possession of that information."[11]

With respect to Fund Level Information "relating to the conduct of the public's business," the Regents has not contended in the trial court or in this court that such

Reuters also argues that the Regents had the burden of proving that the documents requested were not public records and the Regents counters that Reuters, as the petitioner, had the burden of proof (see Gov. Code, § 6259, subd. (a); Evid. Code, § 500). California courts are clear that the public agency has the burden of proof when asserting an exemption under the CPRA or when claiming certain documents should be redacted. (See, e.g., *Humane Society of the United States v. Superior Court* (2013) 214 Cal.App.4th 1233, 1255; *American Civil Liberties Union of Northern California v. Superior Court* (2011) 202 Cal.App.4th 55, 82, 84.) We are not aware of any California case that has addressed the burden of proof as to whether a particular document is a "public record" under section 6252, subdivision (e). Federal courts have held that the public agency has the burden of demonstrating "that the materials sought are not 'agency records' or have not been 'improperly' 'withheld.' " (*United States Dept. of Justice v. Tax Analysts* (1989) 492 U.S. 136, 142, fn. 3.)

Here, we assume, without deciding, that the Regents has the burden since it was undisputed that the information sought relates to the public business. In any event, we have reviewed the public portion of the Regents's declarations and conclude that substantial evidence supported the trial court's finding that none of the four criteria in section 6252, subdivision (e) applies to the documents that are the subject of this writ.

[11] The trial court's use of the modifier "directly" does not suggest that the Regents "indirectly" prepared, owned, used, or retained the individual fund information Reuters seeks. Apart from information inadvertently provided to the Regents in connection with a 2010 offering, there is no evidence in the record that supports a finding the Regents prepared, owned, used, or retained the information sought, whether directly or indirectly.

information does not relate to the public's business.  Indeed, when such information was sought in the *CUE* case, it acknowledged that such information constituted public records because it relates to the public's business and the Regents used and retained such information.  However, the Regents does contend that whether the information falls within the meaning of "public records" is not determined by whether it has or might have *constructive* possession of them.

We agree with the Regents.  The statute unambiguously states that " '[p]ublic records' " include "any writing containing information relating to the conduct of the public's business prepared, owned, used, or retained by any state or local agency regardless of physical form or characteristics." (§ 6252, subd. (e).)  Thus, unless the writing is related "to the conduct of the public's business" *and* is "prepared, owned, used, or retained by" a public entity, it is not a public record under the CPRA, and its disclosure would not be governed by the Act.  No words in this statute suggest that the public entity has an obligation to obtain documents even though it has not prepared, owned, used, or retained them.  " 'Where the words of the statute are clear, we may not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history.' " (*Trope v. Katz* (1995) 11 Cal.4th 274, 280.)  As already discussed, the trial court found that none of the documents sought was prepared, owned, used, or retained by the Regents.  Accordingly, under the plain meaning of the statute, and applying the requirements of Article I, section 3, subdivision (b)(2) of the California Constitution, the Regents did not have to obtain the individual fund information that is the subject of Reuters' petition,[12] and the trial court improperly added language to section 6252, subdivision (e).[13]

---

[12]  In accordance with the California Rules of Court, the documents lodged under seal in the trial court were filed under seal in this court.  (See Cal. Rules of Court, rule 8.46(c).)  We have reviewed the publicly filed redacted versions of these documents and have concluded that we do not need to use or rely upon the unredacted version of any of the documents filed under seal.

[13]  Since the meaning of the statute is unambiguous, Reuters' argument about the Legislature's intent is largely irrelevant.

15

Although we need not go any further because the language of the statute is clear and unambiguous (see, e.g., *Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735), we note that the plain meaning of the statute is supported by public policy and is in harmony with other provisions in the CPRA. The purpose of the CPRA is to ensure public access to vital information about the government's conduct of its business. (§ 6250;[14] see also *City of San Jose v. Superior Court* (1999) 74 Cal.App.4th 1008, 1016.) The people's right to know, however, is not absolute. The CPRA provides for more than two dozen specific exemptions (§ 6254 et seq.), including a "catch-all" exemption (§ 6255). Indeed, the Regents receives significant materials that are exempt under section 6254.26, subdivision (a), including due diligence and portfolio company information. Thus, the Act is clear that the Legislature intended to restrict the public's access to some material. A literal interpretation of section 6252, subdivision (e), is consistent with the purpose of providing the public with access to public records while recognizing that the access has some limits.

Furthermore, the definition of public records in section 6252, subdivision (e), is consonant with the Supreme Court's interpretation of "agency record" under the federal Freedom of Information Act (FOIA; 5 U.S.C. § 552 et seq.). The PRA "was modeled on its federal predecessor," the FOIA, and therefore, "[t]he legislative history and judicial construction of the FOIA . . . 'serve to illuminate the interpretation of its California counterpart.' " (*Times Mirror Co. v. Superior Court* (1991) 53 Cal.3d 1325, 1338.) As Reuters points out, the language in the FOIA is not identical and there are significant differences between the FOIA and CPRA. Still, the policy underlying the FOIA is similar to that of the CPRA.

To qualify as an "agency record" subject to FOIA disclosure rules, "an agency must 'either create or obtain' the requested materials," and "the agency must be in control of [them] at the time the FOIA request is made." (*United States Dept. of Justice v. Tax*

---

[14] Section 6250 provides: "In enacting [the CPRA], the Legislature, mindful of the right of individuals to privacy, finds and declare that access to information concerning the conduct of the people's business is a fundamental and necessary right of every person in this state."

16

*Analysts*, *supra*, 429 U.S. at pp. 144-145; *Forsham v. Harris* (1980) 445 U.S. 169, 177.) The fact that an agency has access to data produced by its grantee does not mean that production of the data is required under the FOIA. (*Forsham*, at pp. 177-178 [information generated by a privately controlled organization, which has received grant funds from an agency, does not constitute agency records under the FOIA when the agency has not at any time obtained this information].) Similarly to the FOIA, no language in the CPRA creates an obligation to create or obtain a particular record when the document is not prepared, owned, used, or retained by the public agency.

When interpreting the meaning of public records, the trial court correctly pointed out that under section 6253, subdivision (c) of the Act, public agencies have an obligation to produce "disclosable public records in the possession of the agency . . . ." However, the trial court erred in importing the requirement that public records be produced into the definition of public records. Properly read, section 6253, subdivision (c) does not alter the definition of public records set forth in section 6252, subdivision (e). Rather, it states a requirement that public records, as defined in section 6252, subdivision (e), which are "disclosable," that is, not subject to any one or more of the many exemptions from disclosure set forth in section 6254 et seq., shall be produced on the timeline specified.

Further, the trial court's reliance on *Consolidated Irrigation Dist. v. Superior Court* (2012) 205 Cal.App.4th 697, 710 (*Consolidated Irrigation*) for the proposition that "possession" as used in section 6253, subdivision (c) includes "constructive possession" is misplaced insofar as the trial court and Reuters seek to incorporate constructive possession into the definition of public records. In *Consolidated Irrigation,* the court held that there was substantial evidence to support an implied finding by the trial court that a sub-consultant's files regarding an environmental impact report were not in the constructive possession of defendant city. It so held because the city's contract with its contractor could not be read as giving the city control over selection of a sub-consultant or over any such sub-consultant's files. (*Id.* at p. 711.) The court reached its conclusion without considering whether the consultant's files "were prepared, owned, used, or retained" by the city and, thus, constituted a "public record" for purposes of section 6252,

17

subdivision (e) because of its determination that the records of a sub-consultant were not "in the possession" of the city within the meaning of section 6253, subdivision (c).[15]

The court in *Consolidated Irrigation*, specified that it was insufficient to show that the files were public records; to prevail under section 6253, subdivision (c), the petitioner had to establish that the files "(1) qualify as 'public records' *and* (2) were in the possession" of the city. (*Consolidated Irrigation, supra,* 205 Cal.App.4th at p. 709, italics added.) The trial court in the present case seems to have conflated these two distinct inquiries. Here, the trial court should not have considered the meaning of "possession," since it found that the requested documents were not "directly prepared, owned, used, or retained" by the Regents and were thus not public records as defined by the CPRA. (See § 6252, subd. (e).)

The trial court also cited, and Reuters relies upon, *Commission on Peace Officer Standards & Training v. Superior Court* (2007) 42 Cal. 4th 278 (*CPOST*) for the

---

[15] We need not decide whether the language in *Consolidated Irrigation* suggesting that section 6253, subdivision (c) includes actual or constructive possession is a correct reading of the CPRA. We note, however, that *Consolidated Irrigation* cited *Bernardi v. County of Monterey* (2008) 167 Cal.App.4th 1379 and *Batt v. City and County of San Francisco* (2010) 184 Cal.App.4th 163, 172, as cases in which a control test was applied to determine whether constructive possession existed. *Bernardi* was a CPRA case arising out of an allegedly inadequate environmental impact report. A special master appointed by the trial court applied the test of whether a consultant was the county's agent and whether the county thus had actual or constructive possession of its agent's records. (*Bernardi,* at pp. 1386-1387.) However, the appellate court was not asked to rule on whether that was an appropriate approach—it mentioned the trial court and special master's rulings and recommendations, respectively, as part of its discussion of the background. The only issue before the court was the reasonableness of an attorneys' fee award. (*Id.* at pp. 1395-1399.) *Batt* was not a CPRA case. The court there upheld application of a hotel occupancy tax to charges for parking spaces in part with the observation that "possession" can be actual or constructive and generally denotes control, custody or dominion. (*Batt,* at p. 172.) The case has nothing to do with whether the records of a party doing business with a public agency are covered by the CPRA. " ' "It is axiomatic that language in a judicial opinion is to be understood in accordance with the facts and issues before the court. An opinion is not authority for propositions not considered." ' (*Kinsman v. Unocal Corp.* (2005) 37 Cal.4th 659, 680 . . . , quoting *Chevron U.S.A., Inc. v. Workers' Comp. Appeals Bd.* (1999) 19 Cal.4th 1182, 1195 . . . .)" (*People v. Knoller* (2007) 41 Cal.4th 139, 154-155.)

proposition that "the location in which [the document] is stored" does not matter. (*Id.* at pp. 288, fn. 3, 291.) However, *CPOST* did not involve the question of what constitutes a public record. Rather, in *CPOST*, the Supreme Court was presented with a decision of the Court of Appeal reversing a trial court judgment compelling CPOST to provide the names, dates of appointment and termination, and names of appointing agencies to the Los Angeles Times, which was investigating the incidence of LAPD officers leaving that police force to join others. (*Id.* at p. 287.) The Court of Appeal reversed that judgment on the ground that such information was exempt from disclosure under the CPRA because of the special treatment provided for peace officer personnel records in Penal Code sections 832.7 and 832.8. (*CPOST*, at pp. 287-288.) The Supreme Court reversed, holding that the requested records were not obtained by the Commission from confidential personnel records within the meaning of Penal Code sections 832.7 and 832.8, and that even assuming they could be characterized as personnel or similar files within the meaning of Government Code section 6254, subdivision (c), the public interest in their disclosure outweighed the privacy interests of the officers in question. (*CPOST*, at pp. 289-299.) There was no dispute that the records sought were public records within the meaning of section 6252, subdivision (e). Indeed, footnote three, relied upon by the trial court here, made clear that "[t]he records at issue in the present case are retained by the Commission, a state agency." (*CPOST,* at p. 288, fn. 3.) The Supreme Court did say "[w]e consider it unlikely the Legislature intended to render documents confidential based on their location, rather than their content," but it did so in the context of applying the peace officer personnel file privilege of Penal Code section 832.8. (*CPOST,* at p. 291.) The Supreme Court had no occasion to review the question of whether "possession" in section 6253, subdivision (c) includes constructive possession or whether constructive possession should be written into section 6252, subdivision (e).[16]

---

[16] The other cases cited by Reuters, *Sonoma County Employees' Retirement Assn. v. Superior Court* (2011) 198 Cal.App.4th 986 and *San Gabriel Tribune v. Superior Court* (1983) 143 Cal.App.3d 762 in support of its argument that the focus is on the content rather than the location of a document, are also unavailing. Neither of these cases

The recent decision of Division Five of this court in *Board of Pilot Commissioners v. Superior Court* (2013) 218 Cal.App.4th 577 (*Board of Pilot Commissioners*), brought to our attention after briefing was completed and cited by both sides during argument, is not to the contrary. In that case the trial court had granted a CPRA request of the Pacific Merchant Shipping Association (PMSA) for pilot logs prepared by the San Francisco Bar Pilots, a private organization, and not used or maintained by a public agency, the Board of Pilot Commissioners for the Bays of San Francisco, San Pablo and Suisun (the Board). There was no dispute that the logs related to "an undeniable public interest in safe navigation of vessels in our waterways . . . ." (*Board of Pilot Commissioners*, at p. 596.) The case was complicated by the fact that Captain Bruce Horton served both as Port Agent of the Board, and "is, for at least certain purposes, a public officer . . ." (*id.* at p. 581) *and* as president of the Bar Pilots. Division Five granted the writ petitions of the Board and the Bar Pilots and ordered the trial court to deny the CPRA petition.

Reuters argues that *Board of Pilot Commissioners* stands for the proposition that "possession" within the meaning of section 5253, subdivision (c) includes constructive possession and that such possession should be read into the definition of "public record" under section 5252, subdivision (e). That is incorrect. To the contrary, *Board of Pilot Commissioners* rejected that argument as follows:

---

purports to change the plain meaning of section 6252, subdivision (e). In *Sonoma County*, there was no dispute that the information requested by the newspaper constituted public records under the CPRA; the issue was whether such information was exempt from disclosure under section 31532. Section 6252, subdivision (e), is not mentioned. In *San Gabriel,* the newspaper sought access to financial statements used by the City of West Covina (the City) to evaluate a rate increase for trash collection service. (*San Gabriel,* at p. 767.) The trash collection company had a contractual obligation to submit annual financial statements to the City. The issue was whether the financial data were a private corporation's confidential documents that were obtained in confidence. (*Id.* at p. 771.) The *San Gabriel* court held that these financial statements were public records and had to be disclosed because the trash company had "injected the data into the decision-making process of government" (*id.* at p. 778) and "the City [had] relied on [the statements] in granting the rate increase" (*id.* at p. 775). Thus, in *San Gabriel,* it was immaterial that a third party prepared the financial data because the information was used and relied upon by the City.

"As to the Port Agent, the argument reaches too far. Under PMSA's theory, any and all records held or maintained by a private organization would become public record simply because one of its officers concurrently held a position performing public functions. Whether the record is in the actual or constructive possession of a public official, the requirement is still that the record be required by law to be kept by that official, or that it be ' " 'necessary or convenient to the discharge of his official duty.' " ' (*San Gabriel Tribune v. Superior Court*, *supra*, 143 Cal.App.3d at p. 774 . . . .)

"As to the Board, to prevail PMSA must establish that the files (1) qualify as public records and (2) were in the possession of the Board. [Citation.] 'Possession' in this context has been interpreted to mean both actual and constructive possession. '[A]n agency has constructive possession of records if it has the right to control the records, either directly or through another person. [Citation.]' [*Consolidated Irrigation*, *supra*, 205 Cal.App.4th at pp. 709, 710.]" (*Board of Pilot Commissioners*, *supra*, 218 Cal.App.4th at p. 598.)

*Board of Pilot Commissioners* found it to be dispositive that Captain Horton had never used the pilot logs in the performance of his duties as Port Agent: "The evidentiary record before us does not support a finding that the Pilot Log data is, or ever has been, used by the Port Agent in the performance of his official duty in assignment of bar pilots and is consequently a public record. If the data itself is not a public record, the fact that the Board could theoretically request it from Bar Pilots does not make it so." (*Board of Pilot Commissioners*, *supra*, 218 Cal.App.4th at p. 600.)

*Board of Pilot Commissioners* is entirely consistent with our analysis: "public records" under the CPRA are those records included in the definition set forth in section 6252, subdivision (e). If the document sought is not "prepared, owned, used, or retained" by the public agency it is not a public record even though it may contain information relating to the conduct of the public's business.

Reuters also argues that the Legislature's adoption of section 6254.26 in 2005 makes clear that individual fund information must be disclosed under the CPRA. Reuters is mistaken. Subdivision (a) of section 6254.26 sets forth six categories of records which

21

are declared to be exempt from the CPRA. Subdivision (b) specifies nine categories of information, which are not subject to the new exemption. It is important to note that the defined term "public records" is not used in section 6254.26. The six categories of newly exempt records are introduced by the phrase "[n]otwithstanding any provision of this chapter or other law. . . ." In contrast, subdivision (b) is introduced with the phrase "[n]otwithstanding subdivision (a) . . . ." The Legislature thus made the new exemptions of subdivision (a) broad and all encompassing, without regard to the definition of "[p]ublic records" in section 6252, subdivision (e), but the exceptions to the new exemptions contain no such term. To the contrary, subdivision (b) makes clear that the nine categories of information concerning "alternative investments in which public investment funds invest shall be subject to disclosure pursuant to this chapter . . . ." This chapter includes the definition of "public records" in section 6252, subdivision (e). Hence, properly understood, the specific information about alternative investments while no longer exempt from disclosure based upon a claim of trade secrets, must be "prepared, owned, used, or retained" by the public agency in order to be considered public records.

Nothing in the language of section 6254.26, subdivision (b), which Reuters relies upon as creating a new duty for public agencies to obtain and disclose information about alternative investments, can be read as expanding the definition of "public records" to include information that is not prepared, owned, used, or retained by public agencies. Moreover, it is clear from the Legislature's statement of intent in the uncodified section 1 of Senate Bill No. 439 (quoted in full at fn. 5, *ante*) that the purpose of creating this exemption, but limiting its application as to specified information, was to find a balance between the strong policy articulated in the CPRA and the state Constitution that expenditures of public funds be open to public scrutiny with the desire of public agencies like the Regents to be able to invest with top tier fund managers like Kleiner Perkins and Sequoia who will not accept investments from public agencies unless they can keep their individual fund performance data confidential.

Reuters emphasizes that years earlier when Kleiner Perkins and Sequoia provided the Regents with the same type of information now being requested, the Regents

disclosed it under the CPRA. Additionally, the Regents currently receives and discloses this same information for other venture capital investments. Reuters argues that excluding constructive possession from the definition of public records will impermissibly permit the Regents to transform public records into private ones by refusing to obtain them or improperly giving the control of disclosure to the venture capitalists. Reuters stresses that section 6253.3 states that a public agency "may not allow another party to control the disclosure of information that is otherwise subject to disclosure pursuant to this chapter." Reuters also relies on the following language in *International Federation of Professional & Technical Engineers, Local 21, AFL-CIO v. Superior Court* (2007) 42 Cal.4th 319, 336: "Whether or not a particular type of record is exempt should not depend upon the peculiar practice of the government entity at issue—otherwise, an agency could transform public records into private ones simply by refusing to disclose them over a period of time." (*Id.* at p. 336.)

Reuters' argument is unpersuasive: The documents now being requested (unlike those which the Regents used and retained prior to 2003) were never public records under the CPRA. Thus, they are not documents "*otherwise* subject to disclosure . . . ." (§ 6253.3, italics added.) Although the documents currently requested contain the same type of financial information that the Regents was ordered to disclose under the CPRA 10 years ago, nothing in the CPRA suggests that *particular categories* of documents are public documents when the particular documents requested are not being prepared, owned, used, or retained by the public agency.

Reuters also complains that omitting constructive possession from the definition of a public record will permit Kleiner Perkins and Sequoia to avoid having their confidential information disclosed. The trial court found that Kleiner Perkins and Sequoia are not engaged in the public's business and their records are therefore properly not subject to the CPRA.

Implicit in Reuters' argument is the notion that refusing to add constructive possession to the definition of public records will result in the Regents's circumventing its duty to release information under the Act by simply avoiding the receipt of specific

23

information.  We do not believe that refusing to add constructive possession into the definition of public records will frustrate the Act's purpose of enhancing governmental accountability through a general policy of access to information.  If the Regents determines that it *needs* particular information to perform its fiduciary obligation of prudently investing and monitoring its investments, nothing in this record suggests it will avoid receiving that information or violate its fiduciary duty in order to shield itself from its obligations to disclose under the CPRA.  Here, the Regents garnered a considerable amount of information that it deemed sufficient to make and monitor its investment decisions, much of which is specifically exempt from disclosure under section 6254.26, subdivision (a), and voluntarily divulged the non-exempt information which it prepared, owned, used, or retained on its website without waiting for a CPRA request to be served.

Under the express and plain language of section 6252, subdivision (e), the documents requested in Reuters' petition are not public records and do not need to be obtained for purposes of disclosure by the Regents.  Accordingly, the trial court erred in granting Reuters' petition for writ of mandate with respect to individual fund information not prepared, owned, used, or retained by the Regents.

## II. *The Trial Court Must Comply with California Rules of Court, Rule 2.551(b)(6)*

In the present case, the Regents is not challenging the trial court's ruling pursuant to California Rules of Court, rule 2.550, regarding which documents the court deemed public and which records it determined should be sealed.[17]  Rather, the Regents objects to the trial court's refusal to return to the Regents those documents deemed public to permit the Regents to choose whether to refile unredacted versions of the documents.  In the trial court and in this court, Reuters does not oppose the Regents's position that rule 2.551(b)(6) requires the trial court to return to the Regents the documents that it lodged pursuant to rule 2.551(b)(4).

Rule 2.551 sets forth the procedural requirements for moving to seal trial records.  In the present case, the Regents filed its four motions to seal pursuant to rule 2.551(b)(4).

---

[17]  All further unspecified rules refer to the California Rules of Court.

24

This rule provides: "The party requesting that a record be filed under seal must lodge it with the court . . . when the motion or application is made . . . . Pending the determination of the motion or application, the lodged record will be conditionally under seal." Rule 2.551(b)(6) states: "If the court denies the motion or application to seal, the clerk must return the lodged record to the submitting party and must not place it in the case file unless that party notifies the clerk in writing within 10 days after the order denying the motion or application that the record is to be filed."

Here, the Regents did not notify the clerk that the records could be filed. To the contrary, the Regents made it clear to the court that it wished the documents to be returned to it. At the hearing on December 7, 2012, counsel for the Regents asked the court whether it intended to order the clerk to return all the material lodged under seal to permit the parties to refile the materials consistent with the court's rulings. Counsel referred the court to rule 2.551(b)(6) and explained that after the court denies a motion to seal, the rule requires the court to return those documents to the moving party to permit that party to decide whether or not to file to avoid public disclosure. The court answered: "I'm going to have to think about it, to tell you the truth, because I had not—I had not really thought about how that rule interacts with a motion that's granted in part and denied in part. When I've seen sealing motions before, quite frankly, it's been a grant or deny. I've not had one with this—that's been this complex."

Counsel for the Regents asked the court whether it understood the Regents's position. The court responded: "Right. You want—if I deny the motion as to any document, you want it returned. I think that's what the rule says on its face. So I think that's what the court will do, [and] just return the documents submitted by either party as to which the motion was denied, and then you can do what you want with it." The court added: "And I won't have to, you know, sanction anything the [Regents] or Reuters [is] doing, which is not in the statute. I will just follow the statute and give you the documents back, and if you want to resubmit them, you can do it."

Counsel for the Regents requested the court to include the foregoing in its order. The court responded that it was not going to include this in the order but it was "going to

follow the statute." The court elaborated: "So let me leave it like this right now. I'm going to return—I'm going to follow the statute. Documents as to which sealing has been denied will be returned to the parties, and the parties can decide what to do going forward. I'm not making any other order in that regard."

On February 19, 2013, the court filed its order on the judgment and writ, and motions to seal. The court found that the Regents is judicially estopped from requesting the return of the documents because it agreed that the court should consider this evidence in evaluating the merits of Reuters' petition. The Regents contends that the trial court erred in making this ruling. We agree.

" ' " ' "Judicial estoppel precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position. . . ." ' The doctrine [most appropriately] applies when: '(1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true); (4) the two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake.' " . . . [¶] The doctrine's dual goals are to maintain the integrity of the judicial system and to protect parties from opponents' unfair strategies. . . ." ' " . . . Consistent with these purposes, numerous decisions have made clear that judicial estoppel *is an equitable doctrine,* and its application, even where all necessary elements are present, is discretionary.' [Citation.] 'The determination of whether judicial estoppel can apply to the facts is a question of law reviewed de novo, i.e., independently [citations], but the findings of fact upon which the application of judicial estoppel is based are reviewed under the substantial evidence standard of review. [Citations.] [¶] Even if the necessary elements of judicial estoppel are found, because judicial estoppel is an equitable doctrine [citations], whether it should be applied is a matter within the discretion of the trial court. [Citations.] The exercise of discretion for an equitable determination is reviewed under an abuse of discretion standard.' [Citation.]" (*Miller v.*

26

*Bank of America, N.A.* (2013) 213 Cal.App.4th 1, 9-10; see also *The Swahn Group, Inc. v. Segal, supra,* 183 Cal.App.4th at p. 841.)

Here, nothing in the record supports a finding that the Regents took two inconsistent positions either with respect to the merits of Reuters' petition or with respect to its four motions to seal. To the contrary, the record establishes that the Regents consistently asserted that it was not obligated to obtain and disclose individual fund information (and lost on that) and that the trial court was obligated under rule 2.551(b)(6) to return the documents deemed public to permit it to decide whether it wished to refile these documents and/or to file redacted portions of these documents (and lost on that too). Further, the Regents made its position explicit with respect to return of any documents the trial court viewed as not appropriate for sealing at the hearing on December 7, 2012. Earlier, in June 2012, the parties stipulated to an order regarding confidentiality that permitted the Regents to designate documents highly confidential for purposes of discovery, but nothing in this stipulation was contrary to its position that it wanted to have the discretion to determine what documents to file under rule 2.551(b)(6). Thus, the doctrine of judicial estoppel has no application to these proceedings and the trial court erred when it refused to comply with the dictates of rule 2.551(b)(6).

Rule 2.551(b)(6) is a procedural rule and the Regents must demonstrate prejudice. The Regents asserts that it submitted sensitive information in reliance on rule 2.551(b)(6), and that it would never have provided this information had it known that it would not be able to decide whether this information should be made public. We agree that it is inherently prejudicial when a party, at variance with the mandate of a rule of court, is deprived of the discretion to determine whether to file sensitive information that will be part of the public record.

We note that it is not unusual for a trial court to defer ruling on a motion to seal until after it has considered the merits of the underlying motion or petition. There are good reasons for this practice which in a particular case may include judicial efficiency and a desire to await ruling on a sealing motion until the court is better informed about the case through consideration of the underlying merits motion. However, Rule

27

2.551(b)(6) is clear:  when the court denies or denies in part the request to seal, and the submitting party elects not to have its provisionally sealed documents become a part of the record, the court must return the lodged documents as required by rule 2.551(b)(6). In such a situation, the court bears the risk that it may have to reevaluate the merits of the motion or petition if its decision was based on provisionally sealed material that the submitting party elects not to  refile.

## DISPOSITION

The petition filed in this court is granted.  Let a peremptory writ of mandate issue directing the superior court to set aside and vacate its February 4, 2013 order and corresponding judgment and writ of mandate, and enter a new judgment (1) denying Reuters' petition for writ of mandate to compel the Regents to "make an objectively reasonable effort to obtain" records from Kleiner Perkins and Sequoia and (2) directing the clerk of the superior court to return those documents that were ordered not sealed, and that were lodged provisionally under seal by the Regents.  The previously issued stay shall dissolve upon issuance of the remittitur.  The Regents shall recover its costs.

_____
Brick, J.*


We concur:


_____
Kline, P.J.


_____
Richman, J.


* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

28

Trial Court:                                       Alameda County Superior Court

Trial Judge:                                       Hon. Evelio Grillo

Attorneys for Petitioner:                  Crowell & Moring
                                                   J. Daniel Sharp

                                                   Michael R. Goldstein
                                                   Karen J. Petrulakis
                                                   Margaret L. Wu
                                                   Charles F. Robinson

Attorneys for Amicus Curiae             City of Santa Rosa
League of California Cities on           City Attorney's Office
behalf of Petitioner:                      Caroline L. Fowler

No appearance for Respondent.

Attorneys for Real Party In Interest:   Ram, Olson, Cereghino & Kopczynski
                                                   Karl Olson